# IN THE UNITED STATES DISTRICT COURT FOR
# THE SOUTHERN DISTRICT OF WEST VIRGINIA

## HUNTINGTON DIVISION

SHEILA L. McCOY,

        Plaintiff,

v.                                                              CIVIL ACTION NO. 3:17-4329

DIAMOND ELECTRIC
MFG. CORPORATION,

        Defendant.

## MEMORANDUM OPINION AND ORDER

Pending before the Court is the Motion for Summary Judgment submitted by Defendant Diamond Electric Mfg. Corporation. *Def.'s Mot. for Summ. J.*, ECF No. 25. Plaintiff alleges, in her complaint, claims against Defendant under four causes of action: (1) Family Medical Leave Act ("FMLA") interference; (2) FMLA retaliation; (3) violation of the West Virginia Human Rights Act ("WVHRA"); and (4) intentional infliction of emotional distress ("IIED"). *See Compl.*, ECF No. 1, at 5–8.

Defendant moves for summary judgment on all four counts Plaintiff asserts against it in the complaint. *Mem. in Supp. of Def.'s Mot. for Summ. J.*, ECF No. 26, at 10, 14, 17. Defendant claims it is entitled to summary judgment on counts one, two, and three because Plaintiff has no evidence that she was either prevented from, or terminated for, exercising her FMLA rights, and has no evidence that she was terminated because of her allegedly protected status. *See id.* at 10, 13–14. Additionally, Defendant claims it is entitled to summary judgment on count four because the way Plaintiff was terminated cannot be considered "outrageous" as a matter of law. *See id.* at 17.

The parties have fully briefed the issues and the motion is now ripe for adjudication. As explained below, the Court **GRANTS**, **IN PART**, **AND DENIES**, **IN PART**, Defendant's Motion for Summary Judgment.

## I. BACKGROUND

### A. Defendant's FMLA Process

Plaintiff was a production employee for Defendant from May 7, 1997, until December 29, 2016, when she was terminated. *Compl.*, at ¶ 7. Two months before her termination, on October 31, 2016, Plaintiff requested intermittent FMLA leave to care for her father, who was battling lung cancer, and Defendant approved. *See id.* at ¶¶ 17–19.

When an employee of Defendant is on intermittent FMLA leave, and requests a day off, the duties of the employee's supervisor are simple. The employee calls their supervisor on a day when they are taking an absence, and the supervisor is not permitted to ask the employee any questions. *Dep. of Crouch*, ECF No. 25-4, at 3. The supervisor then writes the employee's comments on a "leave request" form, including whether the reason for the leave is the FMLA. *See id.* at 3–4. The supervisor then completes her job by sending this form to Human Resources. *See id.*

### B. The Incident

According to Plaintiff, on December 22, 2016, she called her supervisor, Bonnie Crouch, and told Ms. Crouch that her finger was bleeding and she needed to see a doctor. *Dep. of McCoy*, ECF No. 29-1, at 5. Plaintiff asked Ms. Crouch whether a potential absence due to this injury—because it occurred while she was caring for her father—would be covered under the FMLA. *See id.* Ms. Crouch informed Plaintiff that she did not know the answer, and did not want to give an answer, because only Human Resources can respond to FMLA questions. *See id.* Plaintiff then

called Veronica Blevins, Defendant's Human Resources manager, explained that she cut her finger, and asked Ms. Blevins the same question she asked Ms. Crouch: whether an absence in this situation would be covered under the FMLA. *See id.* Ms. Crouch answered Plaintiff's question by stating that "it was a different instance," but if Plaintiff "could go to the doctor and get an excuse, then they would cover it." *Id.* After receiving this clarification from Ms. Blevins, Plaintiff called Ms. Crouch for a second time, and told Ms. Crouch that she "would have to have a doctor's excuse." *Id.* Ms. Crouch said "no," and that the leave absence form would "have to [say] FMLA because you said it was an FMLA." *Id.*

Defendant's version of the events differs greatly from Plaintiff's. Ms. Crouch testified that in Plaintiff's first phone call Plaintiff told her that Plaintiff had cut her hand, and when Ms. Crouch asked whether Plaintiff was coming into work that day Plaintiff said, "I don't know," and that she would "get back with" her. *See Mem. in Supp. of Def.'s Mot. for Summ. J.*, at 4. Later, according to Ms. Crouch, Plaintiff called a second time and said, "I'm going to have to take an FMLA day." *Dep. of Crouch*, at 5. Ms. Crouch, as she is trained to do, did not ask any questions and filled out the leave request form, designating December 22 as an FMLA day for Plaintiff. *Id.*

According to Defendant, after this phone call Plaintiff called Ms. Blevins and told her that Plaintiff was "taking an FMLA day" and wanted to know how this would affect her holiday pay. *See Dep. of Blevins*, ECF. No. 25-5, at 9. Ms. Blevins explained to Plaintiff that she would not receive holiday pay unless she had vacation time to run concurrent with her FMLA day. *See id.* at 4; *Mem. in Supp. of Def.'s Mot. for Summ. J.*, at 6. Upon hearing this explanation, Plaintiff told Ms. Blevins that she needed to change the reason for her absence from the FMLA to the fact that she had cut her hand and needed to go to the emergency room. *See Dep. of Blevins*, at 4–5. Plaintiff then told Ms. Blevins that she "didn't want to get in trouble," and asked Ms. Blevins if Ms. Blevins

could "get her paperwork and correct her paperwork for her so that she wouldn't get in trouble." *Id.* at 5. In response, Ms. Blevins explained to Plaintiff that she could not do what Plaintiff requested, as such an action would be "falsifying records." *Id.* Ms. Blevins then immediately contacted Ms. Crouch and asked her if Plaintiff had called in, and if so, what Plaintiff said to Ms. Crouch. *See id.* at 6. Ms. Crouch told Ms. Blevins that Plaintiff had "requested an FMLA day." *Id.* at 7.

### C. The Investigation and Termination

Following the incident, Ms. Blevins conducted an investigation. She spoke with Ms. Crouch, reviewed the holiday policy in Defendant's handbook, reviewed Plaintiff's leave request form, and reviewed Defendant's employee conduct rules regarding falsifying or misrepresenting records. *See Mem. in Supp. of Def.'s Mot. for Summ. J.*, at 7. After returning from the holiday break, Ms. Blevins met with Chad Carte, Defendant's CFO, discussed the investigation, and made the decision to terminate Plaintiff's employment. *Exhibit F*, ECF No. 25-6, at 2.

On December 29, 2016, Ms. Blevins and Defendant's Human Resources specialist Chris Snyder met with Plaintiff to terminate her employment. *Dep. of Blevins*, at 11. During the meeting, Ms. Blevins explained to Plaintiff that she was being terminated because she lied about her reason for an absence and attempted to falsify documents. *See id.* Ms. Blevins then walked with Plaintiff to her locker, stayed with her while she removed her items, and explained to Plaintiff that she could contact her at any time if she had any questions. *See id.* at 12. Plaintiff thanked Ms. Blevins and left the property. *See id.*

On November 16, 2017, Plaintiff filed this action against Defendant, and on December 14, 2018, Defendant filed its motion for summary judgment. ECF Nos. 1, 25. Plaintiff filed her

response and Defendant filed its reply on January 10, 2019, and January 17, 2019, respectively. ECF Nos. 29, 30.

## II. STANDARD OF REVIEW

To obtain summary judgment, the moving party must show that no genuine issue as to any material fact remains and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, a court will not "weigh the evidence and determine the truth of the matter[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, a court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986). Any inference, however, "must fall within the range of reasonable probability and not be so tenuous as to amount to speculation or conjecture." *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001) (citation omitted). Therefore, summary judgment will not be granted if a reasonable jury could return a verdict for the non-moving party on the evidence presented. *See Anderson*, 477 U.S. at 247–48.

## III. DISCUSSION

### A. Count One: FMLA Interference

Plaintiff's FMLA interference claim relies upon the conclusion that Defendant "failed to responsively answer [Plaintiff's FMLA] questions"—an undisputed violation of the FMLA according to its regulations. *Response in Opp. to Def.'s Mot. for Summ. J.*, ECF No. 29, at 11. However, the facts of this case simply cannot support Plaintiff's conclusion.

The FMLA allows "employees to balance their work and family life by taking reasonable unpaid leave for … the care of a child, spouse, or parent who has a serious health condition,"[1] and

---

[1] 29 CFR § 825.101(a).

the Act states that "[i]t shall be unlawful for any employer to *interfere* with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the Act. 29 U.S.C. § 2615(a)(1) (emphasis added). The FMLA regulations state that an employer "interferes" with a right provided by the FMLA when an employer violates an FMLA regulation. *See* 29 CFR § 825.101(b). One such regulation requires employers "to responsively answer questions from employees concerning their rights and responsibilities under the FMLA." 29 CFR § 825.300(c)(5). Thus, an FMLA interference claim will survive a motion for summary judgment if facts exist that could lead a reasonable juror to conclude that an employer did not responsively answer an employee's questions concerning their rights under the FMLA.

Plaintiff argues that Defendant failed to responsively answer her FMLA questions on two separate occassions. According to Plaintiff, the first failure occurred when Plaintiff asked Ms. Crouch if her injury was covered under the FMLA, but Ms. Crouch responded that "she did not know, and did not want to say." *Response in Opp. to Def.'s Mot. for Summ. J.*, at 10. In isolation, this statement from Ms. Crouch appears to be a failure of Defendant to responsively answer Plaintiff's FMLA question. However, the Court must reach the opposite conclusion when it reads her statement with the additional undisputed facts below.

First, the Diamond Electric Handbook, which Plaintiff received,[2] states that "[i]nformation regarding FMLA can be found on the Company Bulletin Board," and "[f]urther, information may be obtained *through the Human Resources Department.*" Exhibit A, ECF No. 30-1, at 3 (emphasis added). Additionally, Plaintiff's own testimony demonstrates that she knew Human Resources was the proper contact source for FMLA questions:

> A: Then she said—I asked her, I said, "Does this cover FMLA, under Family Medical Leave?" And she said, "I don't know. I don't want to say." So then I –

---

[2] *Exhibit C*, ECF No. 25-3.

> Q: Because she's not HR. Right?
>
> A: Because she's not HR.
>
> Q: Right.
>
> A: Didn't know. So then I called [Human Resources manager] Veronica Blevins in her office.[3]

The above evidence demonstrates that Plaintiff knew that Defendant's Human Resources Department was the proper source for FMLA questions, yet made a deliberate choice to first ask Ms. Crouch, her shift supervisor. As a matter of common sense, the Court cannot hold that Plaintiff's choice to knowingly ask the incorrect employee a question in this situation constitutes Defendant's failure to answer Plaintiff's question. To hold otherwise would require employers to train every one of its employees how to answer all FMLA questions. Thus, as a matter of law, Ms. Crouch's statement to Plaintiff in this particular situation cannot constitute Defendant's failure to responsively answer Plaintiff's FMLA questions.[4]

Plaintiff argues that Defendant's second failure to responsively answer her FMLA question occurred when Plaintiff asked Ms. Blevins the same question that she previously asked Ms. Crouch: whether she could use the FMLA for her hand injury. *Response in Opp. to Def.'s Mot. for Summ. J.*, at 10. According to Plaintiff, Ms. Blevins "told her simply that she would need a doctor's excuse" and that "she cannot tell employees what to do or what to use" regarding leave when they call her. *Id.* at 10. While Plaintiff argues that Ms. Blevins statements could constitute a failure to answer her question, the Court cannot reach the same conclusion after reading both Plaintiff's and Ms. Blevins' testimony.

---

[3] *Dep. of McCoy*, at 5.

[4] Even if the Court were to hold that Ms. Crouch's statement was a failure of Defendant to answer Plaintiff's FMLA question, for the reasons stated in the next paragraph, Defendant nonetheless "responsively answer[ed]" Plaintiff's FMLA question via Ms. Blevins.

First, Ms. Blevins did not "simply" tell Plaintiff that she would need a doctor's excuse. Rather, Ms. Blevins fully answered Plaintiff's FMLA question according to *Plaintiff's* own testimony:

> Q: And did she tell you that a cut finger does not qualify for FMLA?
>
> A: She said – she said it was a different instance, but then she gave me – said that I could come in with – if I could go to the doctor and get an excuse, then they would cover it.[5]

Second, while Ms. Blevins did testify that she does not tell employees what decision to make, this statement does not support Plaintiff's insinuation that Ms. Blevins cannot or does not answer employees' questions. Rather, Ms. Blevins was merely differentiating between answering employees' questions, which is required under the FMLA, and making employees' decisions for them, which is not:

> Q: All right. So tell me about the rest of your conversation with Sheila. I mean, did you ever give her any direction on anything to do, on what to do with her hand outside of just, "If you take the time, bring me in a document"?
>
> A: I don't tell them what to do. *I can tell them, you know, what their options are at that point as noted in here*. I couldn't tell her what to do or what to use. If she, you know, chose to use her FMLA day or chose to go to the ER or whatever, I can't tell them what to do. *All I can do is answer her question that she told me* ….[6]

Thus, the above evidence demonstrates that, as a matter of law, Ms. Blevins did *not* state that she is unable to answer employees' FMLA questions—as Plaintiff insinuates—and Ms. Blevins *did* answer Plaintiff's FMLA question when she told Plaintiff that the FMLA did not apply to Plaintiff's situation, as Plaintiff stated it, because "it was a different instance." Therefore, there

---

[5] *Dep. of McCoy*, at 5.
[6] *Dep. of Blevins*, ECF No. 29-6, at 9 (emphasis added).

is no evidence that Defendant failed to responsively answer Plaintiff's FMLA question, and Defendant's motion for summary judgment as to Plaintiff's FMLA interference claim must be granted.

**B. Count Two: FMLA Retaliation**

Next, Defendant argues that it is entitled to summary judgment as to Plaintiff's FMLA retaliation claim because Plaintiff cannot satisfy two of the three elements of a retaliation claim, and because Plaintiff cannot rebut Defendant's lawful explanation for her termination. *Reply Mem. in Supp. of Def.'s Mot. for Summ. J.*, ECF No. 30, at 4–5, 8. The Court disagrees.

As explained in the previous section, the FMLA states that "[i]t shall be unlawful for any employer to *interfere* with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the Act. 29 U.S.C. § 2615(a)(1) (emphasis added). The FMLA regulations further explain that the "prohibition against interference prohibits an employer from discriminating or *retaliating* against an employee or prospective employee for having exercised or attempted to exercise FMLA rights." 29 CFR § 825.220(c) (emphasis added).

To establish a prima facia case of FMLA retaliation, a plaintiff must prove the following three elements: "(1) she engaged in a protected activity; (2) her employer took an adverse employment action against her; and (3) there was a causal link between the two events." *Adams v. Anne Arundel Cty. Pub. Schs.*, 789 F.3d 422, 429 (4th Cir. 2015). However, even if a plaintiff establishes these three elements, "[i]f the defendant [then] advances a lawful explanation for the alleged retaliatory action, the plaintiff must demonstrate that the defendant's reason for taking the adverse employment action was pretextual." *Id.*

**1. Prima Facia Case**

Defendant first argues that Plaintiff has not set forth any evidence to prove the first element

of a retaliation claim—that she engaged in protected activity—because Plaintiff herself admits that she "did not ask for her December 22 absence to be designated as an FMLA absence." *Reply Mem. in Supp. of Def.'s Mot. for Summ. J.*, at 5. While this fact may be true, it is not dispositive of the issue because Defendant interprets Plaintiff's argument too narrowly. Plaintiff is not necessarily claiming that she engaged in or attempted to engage in protected activity on December 22, but rather because she indisputably engaged in FMLA leave in the past, specifically in October of 2016, while employed by Defendant. *See Mem. in Supp. of Def.'s Mot. for Summ. J.*, at 2; *Dep. of McCoy*, at 3. Thus, Plaintiff has satisfied the first element of proving FMLA retaliation.

Defendant next argues that Plaintiff cannot prove the third element of a retaliation claim—that there was a causal link between her use of the FMLA and her termination. *See Reply Mem. in Supp. of Def.'s Mot. for Summ. J.*, at 6. The Court disagrees, as sufficient evidence exists for a jury to find a causal link between the two events.

First, Plaintiff has presented evidence that her employer viewed her negatively as a result of her leave. For example, when Plaintiff's supervisor from 2013 to 2015—before Plaintiff received intermittent FMLA leave to care for her father—was asked whether Plaintiff was a dependable employee he answered, "[o]h, yes, yes." *Dep. of Serna*, ECF No. 29-5, at 3, 6. Conversely, Plaintiff's supervisor from October of 2016—during the time Plaintiff was permitted to take intermittent FMLA leave—stated that Plaintiff was not the most "dependable" employee because "she did call in a lot, multiple times shall I say, multiple times." *Dep. of Powell*, ECF No. 29-4, at 3, 8. Additionally, the timing of Plaintiff's termination is suspicious. Plaintiff was fired less than two months after she received intermittent FMLA leave and only seven days after she allegedly called in to inquire about FMLA leave. *See Compl.*, at ¶¶ 17–19; *Dep. of Blevins*, at 11. Finally, there is evidence that Defendant is fabricating its reason for firing Plaintiff. Plaintiff

testified that Defendant's alleged reason for firing her—that she attempted to falsify records—is erroneous. All of this evidence, in the aggregate, could lead a reasonable jury to conclude that Plaintiff was viewed unfavorably by Defendant because of her use of the FMLA, and terminated shortly thereafter as a result. Thus, Plaintiff has established a prima facia case of FMLA retaliation.

### 2. Pretext

Defendant next argues that even if Plaintiff can establish a prima facia case for FMLA retaliation, it has a lawful explanation for her termination, and Plaintiff cannot demonstrate that this explanation is pretextual. The Court disagrees, and holds that Plaintiff has met her burden of demonstrating pretext.

As stated earlier, if a defendant advances a "lawful explanation" for a plaintiff's firing, the plaintiff must demonstrate that the defendant's explanation is pretextual. When an employer's lawful explanation for terminating an employee is based upon an administrator's statements, the terminated employee can demonstrate pretext by proving that the administrator was dishonest. *See Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279 (4th Cir. 2000) (holding that plaintiff failed to demonstrate pretext when an employer's lawful explanation for firing plaintiff was based on the plaintiff's supervisor's negative performance evaluations because the plaintiff "fail[ed], for example, to supply evidence that [her supervisor] *actually believed* her performance was good.") (emphasis added).

Unlike the plaintiff in *Hawkins*, Plaintiff in this case has submitted evidence that an administrator, whose statements Defendant relied on in terminating Plaintiff's employment, was not truthful. Ms. Blevins, Defendant's Human Resource Manager, stated that Plaintiff asked her if she could "get her paperwork and correct her paperwork for her so that she wouldn't get in trouble." This version of events from Ms. Blevins is the reason why Defendant terminated Plaintiff,

but Plaintiff disputes Ms. Blevins account entirely. Plaintiff claims that she only asked Ms. Blevins whether an absence in her situation would be covered under the FMLA. Because the Court must draw all reasonable inferences in favor of the nonmoving party, it can certainly be inferred—due to the large difference between the two versions of the conversation—that Plaintiff is not arguing Ms. Blevins' merely misremembered what happened but was instead untruthful. Thus, because Plaintiff's testimony creates a reasonable dispute as to whether Ms. Blevins was dishonest when she stated that Plaintiff attempted to falsify records, Plaintiff can demonstrate pretext.

Defendant argues that Plaintiff merely stating "her version of events" is not evidence of pretext, and cites *Laing v. Fed. Express Corp.*, 703 F.3d 713, 722 (4th Cir. 2013) in support. *See Reply Mem. in Supp. of Def.'s Mot. for Summ. J.*, at 9. The Court finds *Laing* inapplicable to this case. In *Laing*, the Fourth Circuit held that a plaintiff did not establish pretext when she "did not *dispute*" the validity of the records that were relied on in terminating her and did not dispute that the records were "'in fact unacceptable under company policy.'" *Id.* at 717, 722 (emphasis added). Rather, the plaintiff in *Laing* merely "'provided *explanations*'" for why the records appeared to violate company policy. *Id.* at 722 (emphasis added). Consequently, *Laing* would only be applicable to this case if Plaintiff *admitted* that Ms. Blevins' version of events was true, but, for example, tried to *explain* to this Court that she was merely joking, and did not actually want Ms. Blevins to falsify her records. As explained above, Plaintiff is clearly not admitting to Ms. Blevins' version of events but is instead disputing the validity of the evidence used to terminate her, unlike the plaintiff in *Laing*. Therefore, Plaintiff has demonstrated pretext, and Defendant's motion for summary judgment as to Plaintiff's retaliation claim is denied.

**C. Count Three: WVHRA Violation**

In her complaint, Plaintiff claims Defendant violated the WVHRA because "Defendant's termination of Plaintiff's employment was based upon, in whole or in part, on (sic) Plaintiff's perceived disability, and/or being regarded as disabled …." *Compl.*, at ¶ 50. However, as Defendant accurately points out, Plaintiff has produced *no* evidence that there was any connection between her protected status and her termination. As a result, Plaintiff does not even address her WVHRA claim in her response. *See Response in Opp. to Def.'s Mot. for Summ. J*. Because Plaintiff has not set forth any evidence to demonstrate that there was any connection between her protected status and her termination,[7] the Court must grant Defendant's motion for summary judgment as to count three.

**D. Count Four: IIED**

Lastly, Defendant argues that Plaintiff's IIED claim cannot survive summary judgment because its conduct in terminating Plaintiff's employment does not meet the high standard required for an IIED claim. Because the undisputed facts demonstrate that Plaintiff's termination was not unusual, let alone "outrageous," the Court agrees with Defendant.

The Supreme Court of West Virginia has held that for a plaintiff to prevail on an IIED claim, four elements must be established:

> (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and, (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

---

[7] *See Conaway v. Eastern Associated Coal Corp.*, 358 S.E.2d 423, 427 (W. Va. 1986) (holding that "[t]o successfully defend against a motion for summary judgment, the plaintiff must make some showing of fact which would support a prima facie case for his claim.").

*Travis v. Alcon Labs., Inc.*, 504 S.E.2d 419, 425 (W. Va. 1998).

Regarding the first element, "[t]he defendant's conduct must be more than unreasonable, unkind or unfair; it must truly offend community notions of acceptable conduct." *Id.* (internal quotations omitted). Thus, "plaintiffs must necessarily be expected and required to be hardened to … occasional acts that are definitely inconsiderate and unkind." *Id.* at 425–26 (internal quotations omitted). However, [t]he defendant's knowledge that a plaintiff is particularly susceptible to emotional distress *somewhat* alters the above standards for determining whether conduct is 'extreme and outrageous.'" *Id.* at 426 (emphasis added). Additionally, "[t]he employer-employee relationship should entitle an employee to a greater degree of protection from insult and outrage than if he were a stranger to defendants." *Id.* at 427 (internal quotations omitted).

Importantly, under West Virginia law, "the actual act of terminating an employee for an invidious cause cannot be grounds for "outrageous" conduct …." *Councell v. Homer Laughlin China Co.*, 823 F. Supp. 2d 370, 384 (N.D.W. Va. 2011). Thus, in a case such as this where the plaintiff is also arguing that she was wrongfully terminated, the key inquiry is "the outrageous manner by which the employer *effected* the discharge," and the facts relating to the "employer's motivation or reason for the discharge" are not considered. *Dzinglski v. Weirton Steel Corp.*, 445 S.E.2d 219, 226 (W. Va. 1994).

Finally, in determining whether an IIED claim can survive a motion for summary judgment, "[t]he role of … the trial court … is limited to determining whether the defendant's conduct *may* reasonably be regarded as so extreme and outrageous as to permit recovery. If reasonable persons could differ on the issue, the question is one for the jury." *Id.* (internal quotations omitted).

Plaintiff argues that a "reasonable jury may find that [the following] conduct rises to the

level of outrageousness to sustain" an IIED claim: without explanation Defendant required Plaintiff to come to the workplace days after Christmas and accused her of abusing the FMLA and falsifying documents,[8] even though Defendant knew Plaintiff was on approved medical leave carrying for her dying father. *Response in Opp. to Def.'s Mot. for Summ. J.*, at 16. The Court holds, as a matter of law, that such conduct cannot be considered "extreme and outrageous" because the conduct is typical of the average termination. For example, while Defendant "accused" Plaintiff of abusing FMLA and falsifying documents, surely stating to an employee the reason for her firing cannot be considered "extreme and outrageous." Additionally, while the Court is sympathetic to the fact that Plaintiff was terminated shortly after Christmas and while she was caring for her ill father, these circumstances do not result from Defendant's conduct. To hold otherwise would inappropriately allow for an IIED claim when the outrageous conduct merely stems from the discharge itself. Finally, while it may have possibly been "unkind" to not give Plaintiff an explanation before requiring her to come into work, unkind actions as a matter of law are not outrageous.

The Court acknowledges that Defendant was an employer of Plaintiff and had knowledge that Plaintiff may have been "particularly susceptible to emotional distress," but the additional protection Plaintiff receives because of these facts cannot result in a finding that Defendant's conduct was extreme or outrageous due to the rather routine facts involved in this termination. Therefore, because Plaintiff has not set forth sufficient facts to demonstrate that Defendant may have been "outrageous" in effecting her termination, the Court grants summary judgment as to

---

[8] While Plaintiff emphasizes that Defendant "falsely" accused her of abusing the FMLA and falsifying documents, the issue of whether the accusation is true or false is not relevant to this IIED analysis, but rather to an analysis of whether the discharge was wrongful. *See Dzinglski*, 445 S.E.2d at 226 (holding that because a "wrongful discharge action depends solely on the *validity* of the employer's … reason for the discharge" then "any *other conduct* which surrounds the dismissal must be weighed to determine whether the employer's manner of effecting the discharge was outrageous.") (emphasis added).

Plaintiff's IIED claim.

**IV. CONCLUSION**

Based upon the analysis provided above, the Court **GRANTS** Defendant's Motion for Summary Judgment (ECF No. 25) as to counts one, three, and four of the complaint, and **DENIES** Defendant's Motion for Summary Judgment as to count two of the complaint.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER: February 19, 2019

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE